| | | |
|---|---|---|
| **BRICE C. MOORE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **FNU CORPENING, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**THIS MATTER** is before the Court upon initial review of Plaintiff Brice C. Moore's pro se civil rights Complaint, 42 U.S.C. § 1983 (Doc. No. 1). See 28 U.S.C. §§ 1915A, 1915(e). Also before the Court are Plaintiff's Motion for Appointment of Counsel (Doc. No. 2), Motion for Temporary Restraining Order (Doc. No. 3), Motion to Receive Protective Custody (Doc. No. 7), Motion for Speedy Restraining Order and Preliminary Injunction (Doc. No. 8), Motion for Preliminary Injunction/TRO (Doc. No. 12), Motion requesting assistance with grievance process (Doc. No. 13), and Motion to Transfer from Marion Correctional Institution's E-Unit (Doc. No. 22).

## I.    BACKGROUND

On May 25, 2018, Plaintiff, a prisoner of the State of North Carolina, filed a civil rights Complaint pursuant to 42 U.S.C. § 1983 against nine individuals he identifies as employees at Marion Correctional Institution ("MCI").  They are:  H. Corpening, identified as Correctional Administrator; M. Edwards, identified as Administrative Services Manager; C. Crawford, identified as Assistant Superintendent of Programs; D. Watkins, identified as Assistant Superintendent for Custody/Operations; Adam York, identified as Assistant Unit Manager for D-

Unit/Phases 1 and 2, Rehabilitative Diversion Unit; FNU Jenkins, identified as Supervisor for the Rehabilitative Diversion Unit; Michael N. Long, identified as Captain for the Security Risk Group; K. Turner, identified as Unit Manager in D-Unit/Phase 1 of the Rehabilitative Diversion Unit; and FNU Taylor, identified as Unit Facility Sergeant of the Security Risk Group. (Compl. 2-5, Doc. No. 1.)

Plaintiff raises several unrelated claims, which fall under three groups of facts. The first group of facts concerns MCI's rules related to the number of books inmates in the Rehabilitative Diversion Unit may keep in their cells at any one time. The second alleges destruction of some of Plaintiff's law books during inventory searches. The third continues Plaintiff's long-running dispute with the North Carolina Department of Public Safety ("NCDPS") about whether he should be placed in protective custody at each correctional institution he is housed based upon his self-reports that the United Blood Nation ("UBN") has put a "gang hit" on his life. (Compl. 30-33 (citing Moore v. Safrit, et al., No. 5:16-cv-00228 (W.D.N.C. dismissed Aug. 22, 2017) (§ 1983 action claiming Alexander Correctional Institution officials refused to put Plaintiff in protective custody to protect him from a UBN gang hit, destroyed Plaintiff's legal mail, and charged Plaintiff with disciplinary infractions and placed him in long-term segregation "for not putting his life in danger by refusing to return to population"); Moore v. Respass, et al., No. 5:16-ct-3248-BO (E.D.N.C. dismissed July 6, 2017) (§ 1983 action claiming Pasquotank Correctional Institution officials refused to answer grievances, refused to provide Plaintiff protective custody, refused to retain camera footage showing an attempted assault, and charged Plaintiff with disciplinary infractions for refusing to return "to population to let the assault (gang hit) take place"))).

As in his prior complaints, Plaintiff asserts that officials at MCI have ignored his repeated

requests to be put in protective custody to protect him from the alleged UBN gang hit. He also alleges that Defendants have put him in a Catch-22 position, forcing him to choose between either being housed in the Rehabilitative Diversion Unit ("RDU"),[1] where, he contends, he will be attacked and killed by gang members, or being punished with segregation and loss of privileges such as hygiene products, radio, tv, care packages from his family, and canteen privileges for refusing to participate/complete the RDU program. He also alleges retaliation for filing a grievance complaining of the situation.

## II. STANDARD OF REVIEW

Because Plaintiff is a prisoner proceeding in forma pauperis,[2] the Court must review the Complaint to determine whether it is subject to dismissal on the grounds that it is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). In its frivolity review, a court must determine whether the complaint raises an indisputably meritless legal theory or is founded upon clearly baseless factual contentions, such as fantastic or delusional scenarios. Neitzke v. Williams, 490 U.S. 319, 327-28 (1989). A complaint should not be dismissed for failure to state a claim "unless 'after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)).

---

[1] The Rehabilitative Diversion Unit is designed to transition inmates out of a segregation housing environment and provide intensive treatment and programming. See Order Dismiss. § 1983 Compl. at 3, Moore v. Safrit, et al., No. 5:16-cv-00228 (W.D.N.C.), Doc. No. 38.

[2] Plaintiff has filed an application to proceed in forma pauperis. (Doc. No. 16.) On August 14, 2018, the Clerk of Court entered an order waiving the initial filing fee and directing monthly payments to be made from Plaintiff's prison account. (Doc. No. 24.)

A pro se complaint must be construed liberally.  Haines v. Kerner, 404 U.S. 519, 520 (1972); see also Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009) ("Liberal construction of the pleadings is particularly appropriate where . . . there is a pro se complaint raising civil rights issues.").  However, the liberal construction requirement will not permit a district court to ignore a clear failure to allege facts in his complaint which set forth a claim that is cognizable under federal law.  Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990).  A pro se complaint must still contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007); see Ashcroft v. Iqbal, 556 U.S. 662 (2009) (the Twombly plausibility standard applies to all federal civil complaints including those filed under § 1983).  This "plausibility standard requires a plaintiff to demonstrate more than a sheer possibility that a defendant has acted unlawfully."  Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).  He must articulate facts that, when accepted as true, demonstrate he has stated a claim entitling him to relief.  Id.

## III.  DISCUSSION

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual liability under § 1983 must be based on personal participation in the constitutional violation.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978) (stating that under § 1983, liability is personal in nature).  For a supervisor to be personally liable, then, a plaintiff must show that the supervisor "acting under color of state law, caused the deprivation of a federal right."  Kentucky v. Graham, 473 U.S. 159, 166 (1985).  A supervisor can also be liable

under a theory of supervisory liability when: (1) he knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between his inaction and the constitutional injury." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

### A. Federal Rules of Civil Procedure 18(a) and 20(a)(2)

Under Rule 18(a) of the Federal Rules of Civil Procedure, a plaintiff may bring multiple claims, related or not, in a lawsuit against a single defendant. See Fed. R. Civ. P. 18(a). However, to name other defendants in the same lawsuit, the plaintiff must satisfy Rule 20(a)(2), which permits joinder of multiple defendants only where the right to relief asserted against them arises out of the same transaction or occurrence and concerns a common question of law or fact. See Fed. R. Civ. P. 20(a)(2).

Here, Plaintiff's Complaint brings distinct claims against different Defendants, including Eighth Amendment claims against all Defendants based upon deliberate indifference to Plaintiff's safety, a First Amendment retaliation claim against Defendant York, a First Amendment claim against Defendant York based upon destruction of property, a First Amendment Claim against Defendant Corpening based upon RDU policy requiring Plaintiff to keep some of his books in storage and to sign them out when he needs them, and Due Process claims against all Defendants based upon Plaintiff's placement in segregation. Plaintiff's allegations fail to comply with the rules governing the joinder of multiple claims and defendants in the same lawsuit. See George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007) (noting that "[u]nrelated claims against different defendants belong in different suits," so as to prevent prisoners from dodging the fee payment or three-strikes provisions in the Prison Litigation

Reform Act).

According to the facts alleged in the Complaint, when Plaintiff arrived at MCI, an unidentified prison official informed him during processing that inmates in the RDU are allowed to keep only three books in their cells and that the rest had to be mailed home or donated. Plaintiff chose to have his religious books mailed to his family and his law books put into storage at MCI. Plaintiff is required to submit a request form to if he wants one of his books from storage. During an inventory of Plaintiff's property, some of his law materials were damaged or destroyed. (Compl. 6-7.) At some point later in his incarceration, some of Plaintiff's property was destroyed during a cell search when he was moved to a different cell. (Compl. 14.)

Plaintiff claims Defendant York, in his supervisory capacity, violated his First Amendment rights by "letting Plaintiff's Law Book become damaged and torn in half by officials under his authority by destroying Plaintiff's property during inventory of the Plaintiff's property without the Plaintiff being present to ensure that his property remain[ed] safe." (Compl. 27 ¶ 105.) He claims Defendant Corpening, in his supervisory capacity, violated his First Amendment rights by "refusing to curb the wrong for destroying Plaintiff's legal papers, law books, and taking other books such as Webster's Dictionary putting them into Plaintiff's storage" and by imposing/implementing/enforcing(?) "an in-house policy [that] forces Plaintiff to sign forms before checking his property [out of storage] . . . And if Plaintiff sign[s] the forms and some of Plaintiff['s] property is missing, Plaintiff can't recover for damages." (Compl. 27 ¶¶ 107-108.) These claims are wholly unrelated to Plaintiff's Eighth and Fourteenth Amendment claims against all Defendants. Therefore, these First Amendment claims against Defendants York and Corpening (Compl. 27 ¶¶ 105, 107-108) shall be dismissed without prejudice to Plaintiff's ability to raise them and in a separate complaint, see George, 507 F.3d at 607.

## B. Eighth Amendment Claims

Plaintiff claims all Defendants have violated his Eighth Amendment right to be free from cruel and unusual punishment by forcing him to complete the RDU program "that will surely put the Plaintiff [sic] life in greater danger" and refusing to place him in protective custody.  (Compl. 25-26, ¶¶ 99, 101.)  These claims are predicated upon Plaintiff's self-reports that the UBN has put a hit on his life that is to be carried out by gang members at any North Carolina prison where Plaintiff is housed.  Plaintiff alleges he has either written to, spoken to, or attempted to speak to, each of the defendants in this action about the alleged hit, his need for protective custody, and his request to be removed from the RDU program.  He has attached copies of grievances and correspondence with some of the Defendants as exhibits to his Complaint.  (Doc. No. 1-1 at 1-31.)  According to the Complaint, Plaintiff's requests have been ignored, he has been denied protective custody, and he has been punished for refusing to complete the RDU program.

Prison officials are required to protect inmates from violent attacks by other inmates.  See Farmer v. Brennan, 511 U.S. 825, 833 (1994) (holding that prison officials have a duty to protect prisoners from violence "at the hands of other prisoners").  To state a claim for a violation of the Eighth Amendment based on the denial of a prisoner's request to be placed in protective custody, a plaintiff must allege that (1) denial of the request for protective custody posed a substantial risk of serious harm, and (2) the defendant acted with deliberate indifference to that risk.  See Farmer, 511 U.S. at 837.  "A deliberate indifference claim cannot be predicated merely on knowledge of general risks of violence," Weiss v. Cooley, 230 F.3d 1027, 1032 (7th Cir. 2000), or fear of an unrealized attack, see Babcock v. White, 102 F.3d 267, 270 (7th Cir. 1996).  Instead, the plaintiff must establish that the defendant exhibited deliberate or callous indifference to a specific known risk of harm.  See Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987).

"[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 833-834. Put another way, "a prison official [must] actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003) (citing Farmer, 511 U.S. at 837; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir.1995)).

Plaintiff does not allege that he has been attacked, assaulted, or injured by any inmate(s) at MCI. Nor does he allege he has suffered any physical injury from his participation in the RDU program. Consequently, the only remedy available to him is prospective equitable relief. See e.g. 42 U.S.C.A. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury[.]").

"When prospective equitable relief is requested, the requesting party must show an ongoing, personal stake in the outcome of the controversy, a likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." Rezaq v. Nalley, 677 F.3d 1001, 1008 (10th Cir. 2012) (citing Jordan v. Sosa, 654 F.3d 1012, 1024 (10th Cir. 2011) (citing O'Shea v. Littleton, 414 U.S. 488, 502 (1974))). Accordingly, to show he is entitled to prospective injunctive relief on his Eighth Amendment claim, Plaintiff must demonstrate that he faces "a likelihood of substantial and immediate irreparable injury," Rezaq, 677 F.3d at 1008, if he is not removed from the RDU program and placed in protective custody, see Farmer, 511 U.S. at 837. The Court has reviewed the Complaint and attached exhibits and finds that Plaintiff's claim that he is entitled under the Eighth Amendment to an injunction requiring Defendants to remove him from the RDU program and place him in protective custody does not survive initial

review.

According to the Complaint, upon his arrival at MCI on June 20, 2017, Plaintiff was enrolled in Phase 1 of the RDU program and placed in D-Unit for housing.  It appears Plaintiff is still enrolled in Phase I of the RDU program but was moved to administrative segregation in E-Unit on May 3, 2018.[3]  Thus, Plaintiff was in Phase I of the RDU program for almost eleven months before filing the instant Complaint.

Plaintiff contends that he is at substantial risk of immediate irreparable injury because:  1) "a state-wide gang hit by the [UBN] has been put on the Plaintiff to take the Plaintiff [sic] life" (Compl. 18 ¶ 67); 2) many assaults and stabbings have taken place in the RDU program (Compl. 9 ¶ 18; 26 ¶ 102); 3) "many officials all over North Carolina State Prisons [are] setting inmate/s up to be stabbed by Gang Members" (Compl. 13 ¶ 41; 19 ¶¶ 75-76); and 4) "many inmates come[ ] out of their hand-cuffs and attack[ ] other inmates/officers at will."  (Compl. 36 ¶ M). Plaintiff's third contention – that prison officials throughout North Carolina are deliberately setting inmates up to be stabbed by gang members – is rejected as baseless and fantastical.  See Neitzke, 490 U.S. at 327-328.

Although at this stage the Court is required to accept "all well-pleaded allegations in the plaintiff's complaint as true," Veney, 293 F.3d at 730 (citation and internal quotation marks omitted), the Court is not required to accept as true allegations that are "merely conclusory, unwarranted deductions of fact, or unreasonable inferences," or that "contradict matters properly subject to judicial notice or by exhibit," id. (quoting Sprewell v. Golden State Warriors, 266 F.3d

_____

[3] In a letter to Defendant Corpening, Plaintiff states he was moved from D-Unit to E-Unit on May 3, 2018, in retaliation for filing a grievance on April 3, 2018.  (May 10, 2018 Let., Pl.'s Ex. No. 5, Doc. No. 1-1 at 11.) Petitioner's movement to administrative segregation on E-Unit does not moot his Eighth Amendment claim because, according to the Complaint, the move entailed a further loss of privileges, and Plaintiff has not been removed from the RDU program.

979, 988 (9th Cir. 2001)) (internal quotation marks omitted).  The Court takes judicial notice that on December 27, 2016, Plaintiff filed a § 1983 complaint in this Court alleging that officials at Alexander Correctional Institution ("ACI") were violating various of his constitutional rights in denying his request for protective custody.  Specifically, Plaintiff alleged that his "life has been threaten[ed] by gang members with a hit put out on the Plaintiff [sic] life.  This Hit has been issued by Blood members to wherever the Plaintiff is housed on state, to see to the hit is carried out."  See § 1983 Compl. at 2, Moore v. Safrit, et al., 5:16-cv-228-FDW (W.D.N.C.), Doc. No. 1.  According to the complaint, Plaintiff had suffered no injury because he "refuse[d] to return to population to let it take place;" Plaintiff claimed that he faced danger from both staff members and fellow inmates if he returned to the general population in the prison.  See id. at 3.

The Court takes further notice that in a Court-ordered response, ACI officials stated that Plaintiff requested protective custody on October 20, 2016, his request was investigated, and no evidence was found supporting a need for protective custody.  Defs.' Resp. at 4, Moore, 5:16-cv-228-FDW, Doc. No. 15.  Prison officials explained that,

> Plaintiff had reported to them that an individual named Bruce Jones, who was not incarcerated in a DPS facility and with whom Plaintiff had had problems outside of prison, was "out to get him."  Plaintiff reported to prison officials that Jones had "connections [to] Bloods and Folk inmates that were after" Plaintiff.  Plaintiff admitted that he had not received any threats from an active North Carolina inmate and had not been physically injured.

Order Dismiss. § 1983 Compl. at 2-3, id. at Doc. No. 38 (internal citations omitted).  Plaintiff signed a Protective Control Interview Form documenting those responses.  See Safrit Aff. at ¶ 6, id. at Doc. No. 34; Interview. Form, id. at Ex. A, Doc. No. 34-1.  Prison officials "found no evidence to support that Inmate Moore needs protective housing.  The only person he has alleged making any threats to him is not housed at Alexander Correctional Institution and according to [Plaintiff], he is not an inmate at any facility."  Defs.' Resp. at 8-9, id. at Doc. No. 15.

On April 17, 2017, Plaintiff submitted a second request that ACI officials place him in protective custody; he was interviewed the same day and again related that he had been threatened by "Blood members" who had been ordered by Bruce Jones to take his life. Plaintiff signed a Protective Control Interview Form documenting his responses. See Safrit Aff. at ¶ 11, id. at Doc. No. 34; Interview Form, id. at Ex. C, Doc. No. 34-3. ACI officials requested a statement from the facility's intelligence officer, who indicated he had no information about any threat or hit issued against Plaintiff by members of the United Blood Nation or any other security threat group. Id. at ¶ 12. Plaintiff did not challenge the authenticity of the documents submitted by ACI officials recounting the prison's investigations into Plaintiff's allegations. Order Dismiss. § 1983 Compl. at 5 n.1., id. at Doc. No. 38.

Prior to resolution of that case, Plaintiff was transferred to MCI, and the ACI defendants moved to dismiss, contending that Plaintiff's transfer rendered his Eighth Amendment claim against them for prospective injunctive relief moot. Order Dismiss. § 1983 Compl. at 6, Moore, 5:16-cv-228-FDW, Doc. No. 38. Plaintiff filed a response to the motion, asserting that his "life is in danger even here [at Marion]" but making statements indicating he wished to dismiss the case. Id. at 7.

Although the Court construed Plaintiff's response as a motion for voluntary dismissal and granted it without prejudice, id., the Court stated dismissal also was appropriate because Plaintiff's claim that the threat of a "hit" against him will subject him to harm at any prison in the NCDPS system was wholly conclusory and without any specific factual allegations about "when the alleged 'hit' was placed on him, who placed it, the acknowledgment by any fellow inmate—whether or not a Blood gang member—of any awareness of its existence, or the reason he believes it was issued." Id. The Court went on,

In fact, without the court-ordered submission by Alexander officials of documentation relating to Plaintiff's request for protective custody and the limited additional details of the purported threat on Plaintiff contained therein, (Doc. No. 15), the Court would be left with nothing other than Plaintiff's unsubstantiated allegation that the hit exists and that it was issued by unspecified members of the Bloods street gang. . . .

Thus, the Court agrees with Defendant that the Complaint is utterly devoid of sufficient "factual content that allows the court to draw the reasonable inference that" Plaintiff is somehow entitled to prospective injunctive relief. Ashcroft, 556 U.S. at 663 (quoting Twombly, 550 U.S. at 557). As the Supreme Court noted in Ashcroft, a complaint does not suffice to state a facially plausible claim "if it tenders naked assertions devoid of further factual enhancement." Id. (quoting Twombly, 550 U.S. at 557). Moreover, because Plaintiff presumably possesses all of the relevant information regarding the alleged hit and has shared virtually nothing with the Court, this case exemplifies the type wherein the Court 'streamlines litigation by dispensing with needless discovery and fact finding. Neitzke, 490 U.S. at 326-327. Accord Smith v. Butler, No. 15-cv-1277, 2016 WL 5395968, at *3 (S.D. Ill. Sept. 27, 2016) (where the inmate sued for injunctive relief based on prison officials' refusal to place him in protective custody, denying injunctive relief where the plaintiff inmate's "allegations concern vague, non-specific threats").

Order Dismiss. § 1983 Compl., id. at 7-9 (footnotes omitted).

Plaintiff therefore was on notice prior to filing the instant § 1983 Complaint that an Eighth Amendment claim based upon conclusory allegations of a hit ordered by unspecified gang members would be insufficient to state a claim for prospective injunctive relief. See id. Nevertheless, in the Complaint and attached grievances and letters to Defendants, Plaintiff once again asserts in a conclusory fashion without any specific factual allegations that UBN has ordered a hit on his life to be carried out at any prison where he is housed. (Doc. No. 1-1 at 2-3, 7-31.) Other than a vague reference here and there to Plaintiff's unexplained belief that the hit is associated with the crime for which he is incarcerated and that he learned of the hit while at Pasquotank Correctional Institution ("PCI"), there is nothing in the Complaint or the exhibits related to these Defendants indicating when the alleged "hit" was placed, who placed it, why it was placed, or whether any other inmate – UBN-member or not – at PCI, ACI, or MCI has

confirmed, acknowledged, or even speculated about the existence of the hit. In other words, the facts alleged in the Complaint, grievances, and correspondence related to these Defendants are insufficient for the Court to infer there is a substantial risk of serious harm to Plaintiff from UBN gang members at MCI, much less that Defendants are aware of those facts. See Twombly, 550 U.S. at 570 (holding that a pro se complaint must contain sufficient facts "to raise a right to relief above the speculative level"); Weiss v. Cooley, 230 F.3d at 1032 ("A deliberate indifference claim cannot be predicated merely on knowledge of general risks of violence."); Farmer, 511 U.S. at 833-834 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists[.]").

Furthermore, Plaintiff has attached an exhibit that explains the origin of his UBN-ordered hit claim and demonstrates how speculative it is. The exhibit is a letter Plaintiff wrote to an ACI official arguing why he needed protective custody. (Oct. 27, 2017 Let. to Eric Dye, Doc. No. 1-1 at 32-34.) In the letter, Plaintiff describes an incident that occurred at PCI on July 12, 2016, which Plaintiff interpreted as an attempted assault by gang members. According to the letter, while walking to breakfast the next day, Plaintiff was asked by "a guy standing in the lobby" to slide a letter under the door of the Unit Manager's Office; Plaintiff did as he was asked. Later that day, an unidentified prison official told him the letter, which was not signed, stated "someone has a hit on" Plaintiff. Plaintiff wrote that he knew who ordered the hit because he overheard some UBN members talking through a vent, and they mentioned the name "Bruce Jones," a gang member and close relative of Plaintiff's ex-wife's mother or father. (Id. at 33.)

Plaintiff does not indicate when the conversation he heard through the vent occurred relative to the other incidents he describes in the letter. Furthermore, he does not state that he overheard the gang members say Bruce Jones had ordered a hit on someone, much less on him.

Nor has he alleged that any UBN member at PCI, ACI, or MCI has threatened him, mentioned the name "Bruce Jones" to him or in his presence, or attacked him. Indeed, Plaintiff does not allege he has been threatened or attacked by any inmate at PCI, ACI, or MCI. In short, Plaintiff's contention that the threat of a "hit" against him will subject him to harm at any prison in the NCDPS system is conclusory, appears to be based on unwarranted deductions and unreasonable inferences, and is contradicted by "matters properly subject to judicial notice" and by his own exhibits. See Veney, 293 F.3d at 730. Consequently, the Court need not, and does not, accept Plaintiff's allegations of a world-wide UBN hit as true. See id.

Plaintiff's remaining contentions – that he is at substantial risk of immediate irreparable injury because many assaults and stabbings have taken place in the RDU program (Compl. 9 ¶ 18; 26 ¶ 102) and "many inmates come[ ] out of their hand-cuffs and attack[ ] other inmates/officers at will" (Compl. 36 ¶ M) – are vague and conclusory. Plaintiff's own pleadings show the RDU program has multiple phases and involves at least four housing units, each with varying levels of restrictions on inmate movement and interaction. (York June 19, 2017 Resp. to Inmate Claims, Pl.'s Ex. 20, Doc. No. 1-1 at 23; Long July 20, 2017 Let. to Pl., Pl.'s Ex. 26, Doc. No. 1-1 at 28-29.) Inmates like Plaintiff, assigned to Phase I of the RDU program, are separated from the general prison population, brought out of their cells only for appointments, recreation, and showers, kept in full restraints while out of their cells and moved one-at-a-time; they are unrestrained only when locked in their own cells (single occupancy) or are by themselves in a REC cage, which is secured. (Id.) These facts are alleged in correspondence from Defendants York and Long that Plaintiff has attached as exhibits to his Complaint, and Plaintiff does not dispute the accuracy of those facts.

Plaintiff's contentions do not distinguish between alleged assaults, stabbings and

handcuff-slipping in Phase 1 and later less-restrictive phases of the RDU program but are so broad as to cover all phases. As noted, Plaintiff does not allege having been threatened or assaulted by any inmate during Phase 1. Nor does he allege witnessing or having personal knowledge of any inmate assaults or hand cuff-slipping during Phase 1. Even if he could identify instances of inmate-on-inmate assault in the Phase 1 program, Plaintiff has not sufficiently alleged that his risk of being assaulted is greater than any other inmate's in Phase 1. He has not demonstrated "a likelihood of substantial and immediate irreparable injury," based on the possibility of generalized harm that could occur to any inmate in the program. Finally, by his own admission, Plaintiff continues to refuse to complete Phase 1; he cannot demonstrate that he faces immediate irreparable injury based on the possibility of generalized harm that may occur in later phases of the program.

On the facts alleged here, Plaintiff' claim that he is entitled under the Eighth Amendment to an injunction requiring Defendants to remove him from the RDU program and place him in protective custody is frivolous. It shall be dismissed as such. See § 1915(e).

Plaintiff also claims Defendants Corpening, Edwards, Crawford, and Watkins violated his Eighth Amendment rights by "failing to supervise staffs [sic] to take reasonable measures to ensure inmate/s safety from inmate-inmate violence." (Compl. 26 ¶ 100.) Plaintiff does not allege that he has been threatened with, or the victim of, inmate-on-inmate violence while at MCI. Nor has he identified any specific instance when he was at risk of being harmed by another inmate at MCI or alleged plausible facts indicating he faces "a likelihood of substantial and immediate irreparable injury," Rezaq, 677 F.3d at 1008, because of Defendants' actions or failure to act. This claim shall be dismissed as frivolous.

Finally, Plaintiff claims Defendant Long acted with deliberate indifference to Plaintiff's

safety under the Eighth Amendment "by writing false investigations reports about [inter]viewing the Plaintiff" about Plaintiff's safety concerns when he arrived at MCI. (Compl. 26 ¶ 102.) According to Plaintiff, Defendant Long is the captain of the Security Risk Group ("SRG") unit, whose duties include investigating inmates' complaints concerning inmate criminal activity and gang hits and "to have personal interviews with targeted inmate/s by gang-members." (Compl. 18 69.)

> Plaintiff's claim is related to a statement Long made in a letter to Plaintiff,
>
> On 7/12/17 I was assigned to respond to a letter you wrote to Mr. Kenneth Lassiter, Director of Prisons. In your letter, you state your rights are being violated because you are being denied protective custody from gangs, because you state you know a hit has been put out one [sic] you. I have talked with you about this issue both in receiving when you arrived and on the unit. My staff has also spoken to you about this alleged hit. You have failed to provide any names as to who is after you. We have looked into your claims and have been unable to substantiate your claims.

(Long July 20, 2017 Let., Pl.'s Ex. 26, Doc. No. 1-1 at 28.) Plaintiff asserts that contrary to Defendant Long's statement, neither he nor any of his staff has interviewed Plaintiff about his requests to be removed from the RDU program and put in protective custody.

As noted previously, to state a claim for a violation of the Eighth Amendment based on deliberate indifference to prisoner safety, a plaintiff must sufficiently allege the defendant knew the prisoner faced a substantial risk of serious harm and disregarded it. See Farmer, 511 U.S. at 837. Accordingly, it is not enough to allege that Defendant Long's statement is false, Plaintiff also must sufficiently allege that he faced a substantial risk of serious harm. For the reasons already stated, Plaintiff's allegation that a gang-hit poses a substantial risk of serious harm is conclusory and appears to be based on unwarranted deductions and unreasonable inferences. See Veney, 293 F.3d at 730. Therefore, this claim fails to survive initial review and shall be dismissed.

## C. First Amendment Retaliation Claims

Plaintiff alleges that on December 12, 2017, he spoke face-to-face with Defendant York but when he attempted to talk about the UBN-ordered hit, York told him to complete the RDU program or be punished. Plaintiff alleges that York also told him that if he continued to complain and file grievances, "we'll take away a lot more freedom from you." Plaintiff asserts that he did not file a grievance between December 12, 2017 and April 3, 2018 because of York's threats to punish him. On April 3, 2018, apparently triggered by York's refusal on that day to listen to Plaintiff's claims about the gang-hit, Plaintiff wrote a grievance naming some of these Defendants and complaining of their refusal to remove him from the RDU program and to place him in protective custody. Instead of submitting it to MCI officials, however, he mailed the grievance to the NCDPS office in Raleigh, North Carolina, which, in turn, mailed it back to MCI. On May 3, 2018, Plaintiff was moved to segregation and his privileges were restricted. (Pl.'s May 10, 2018 Let., Doc. No. 1-1 at 11.) Plaintiff claims the move and restriction of privileges were retaliation for his filing the April 3 grievance. (Compl. 13-16 ¶¶ 43, 45-46, 52-54.)

Inmates "have no constitutional entitlement or due process interest in access to a grievance procedure." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 541 (4th Cir. 2017), cert. denied, 138 S. Ct. 755 (2018); see also Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any [grievance] procedure voluntarily established by a state."). Prisoners do, however, have a First Amendment right to petition the government for redress of grievances, free from retaliation, Booker, id. at 545. A First Amendment retaliation claim under § 1983 consists of three elements: (1) the plaintiff engaged in constitutionally protected First Amendment activity; (2)

the defendant took an action that adversely affected that protected activity; and (3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct. <u>Martin v. Duffy</u>, 858 F.3d 239, 249 (4th Cir. 2017), <u>cert. denied</u>, 138 S. Ct. 738 (2018). The "plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." <u>Id.</u> Notably, the "plaintiff's actual response to the retaliatory conduct is not dispositive of the question of whether such action would likely deter a person of ordinary firmness." <u>Id.</u> at 250. Finally, the plaintiff must plead sufficient facts to show that the alleged retaliatory act "was taken in response to the exercise of a constitutionally protected right." <u>Adams</u>, 40 F.3d at 75.

Looking at the first element, the protected First Amendment activity identified by Plaintiff in the Complaint is his filing of the April 3, 2018 grievance. (Compl. 15 ¶¶ 52-53.) The April 3, 2018 grievance complains of, among other things, various Defendants' failure/refusal to remove him from the RDU program and place him in protective custody. (April 3, 2018 Grievance, Doc. No. 1-1 at 2-3.) Plaintiff has sufficiently pleaded that he engaged in protected conduct. <u>See</u> <u>Martin</u>, 858 F.3d at 249.

As to the second element, Plaintiff alleges Defendant York retaliated against him for filing the April 3 grievance by having him "moved to segregation for punishments to take place and refus[ed] protective custody." (Compl. ¶¶ 53-55.) "[P]lacing an inmate in administrative segregation could deter a person of ordinary firmness from exercising his First Amendment rights." <u>Id.</u> at 250 (quoting <u>Herron v. Harrison</u>, 203 F.3d 410, 416 (6th Cir. 2000)) (internal citation and quotation marks omitted.) Accordingly, Plaintiff has sufficiently alleged that York took adverse action against him by confining him in segregation.[4]

---

[4] Plaintiff has not sufficiently alleged that York refused protective custody in retaliation for filing the grievance. Based upon the facts alleged in the Complaint, York had denied Plaintiff protective custody since Plaintiff's arrival

Finally, with respect to the third element, the Complaint alleges that Defendant York threatened Plaintiff with further punishment if he filed a grievance; that between December 12, 2017 and April 3, 2018, Plaintiff did not file any grievances because of York's threat; and that a month after Plaintiff wrote the April 3, 2018 grievance, Defendant York moved Plaintiff to segregation and restricted his privileges.  (Compl. ¶¶ 43, 46, 52-53, 55.)  Plaintiff, in fact, filed at least two grievances between December 12, 2017 and April 3, 2018 – No. 3730-2018-DU4N-00138 (Pl.'s Exs., Doc. No. 1-1 at 4, 6) and No. 3730-2018-DU4N-01049 (Doc. No. 1-1 at 5). At least one of those, No. 3730-2018-DU4N-00138, was screened by Defendant York.  (Pl's Exs., Doc. No. 1-1 at 4.)  Plaintiff does not allege Defendant York placed him in segregation or restricted his privileges in retaliation for those grievances.

Nevertheless, on initial review, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff.  See Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).  The Court, therefore, is constrained to find that Plaintiff's First Amendment retaliation claim against Defendant York survives initial review.

Plaintiff also claims Defendant Corpening violated his First Amendment rights "to be free from retaliation and threats from employ[ees] under his supervision to ensure that Plaintiffs [sic] rights are not violated."  (Compl. 26 ¶ 106.)  Plaintiff alleges Corpening "contribute[s] to these violation[s] by an inhouse policy rule to do whatever the officials feels necessary to do." (Compl. 26 ¶ 106.)

As noted, for a supervisor to be liable under a theory of supervisory liability, a plaintiff must show the supervisor:  (1) knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (2) that his response showed

_____

at MCI.

"deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between his inaction and the constitutional injury." Shaw, 13 F.3d at 799. Here, the Complaint identifies only Defendant York as having threatened or retaliated against Plaintiff, and Plaintiff does not allege that Defendant Corpening knew about York's actions. Plaintiff's May 10, 2018 letter to Corpening does not identify York or any other Defendant by name, and it wasn't written until after the alleged violations occurred. Plaintiff's contention that Corpening has implemented "an inhouse policy rule to do whatever the officials feels necessary to do" is conclusory and unsupported by any allegation of fact. This claim shall be dismissed as frivolous.

### D. Fourteenth Amendment Due Process Claims

Plaintiff claims Defendants violated his right to due process under the Fourteenth Amendment by "continuously keeping Plaintiff confined in segregation for not putting the Plaintiff's life in danger" (Compl. 28 ¶ 109), which the Court interprets as "continuously keeping Plaintiff confined in segregation for refusing to comply with/participate in the RDU program," "depriving Plaintiff of his [ability] to purchase personal hygiene materials such as soap, toothbrush, toothpaste, deodorant, etc.[, and] . . . depriving Plaintiff of an opportunity to aggrieve the condition of his confinement." (Compl. 28 ¶¶ 109-111.) These claims shall be dismissed on initial review.

Standard analysis under the Due Process Clause "proceeds in two steps: [the Court] first ask[s] whether there exists a liberty or property interest of which a person has been deprived, and if so [the Court] asks whether the procedures followed by the State were constitutionally sufficient." Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (citing Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 460 (1989)). If no liberty or property interest is at

stake, however, the Constitution does not require due process.  See Wilkinson v. Austin, 545

U.S. 209, 221 (2005).

"A liberty interest may arise from the Constitution itself" or "from an expectation or

interest created by state laws or policies."  Wilkinson, 545 U.S. at 221 (citations omitted); see

also Sandin v. Conner, 515 U.S. 472, 483–84 (1995) ("States may under certain circumstances

create liberty interests which are protected by the Due Process Clause." (citation omitted)).  The

Supreme Court repeatedly has held that a prisoner has no right under the Due Process Clause to

be incarcerated in a particular facility or to be held in a specific security classification, barring

some showing by the prisoner that his confinement posed an atypical and significant hardship in

relationship to the ordinary incidents of prison life.  See Wilkinson, 545 U.S. at 223; Olim v.

Wakinekona, 461 U.S. 238, 245 (1983); Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976).  State-

created liberty interests "will generally be limited to freedom from restraint which, while not

exceeding the sentence in such an unexpected manner as to give rise to protection by the Due

Process Clause of its own force, nonetheless imposes atypical and significant hardship on the

inmate in relation to the ordinary incidents of prison life."  Sandin, 515 U.S. at 483-84.  Thus,

even assuming North Carolina has created a liberty interest in earning, maintaining, or avoiding

certain security or custody classifications, Plaintiff still must "demonstrate that denial of this

state-created interest resulted in an 'atypical and significant hardship[.]'"  Prieto v. Clarke, 780

F.3d 245, 250 (4th Cir. 2015) (quoting Sandin, 545 U.S. at 484).

"The 'conditions dictated by a prisoner's conviction and sentence are the conditions

constituting the ordinary incidents of prison life *for that prisoner*.'"  Incumaa v. Stirling, 791

F.3d 517, 528 (4th Cir. 2015), as amended (July 7, 2015) (quoting Prieto, 780 F.3d at 254

(emphasis supplied) (citation and internal quotation marks omitted)).  For initial review

purposes, the Court will assume Plaintiff originally was sentenced to the general population, and the conditions constituting the ordinary incidents of prison life for Plaintiff are those that inmates in the general population normally experience.  See Icumaa, 791 F.3d at 528-29 (explaining that the general prison population "is the touchstone in cases where the inmate asserting a liberty interest was sentenced to confinement in the general population and later transferred to security detention." (citing Prieto, 780 F.3d at 252.)) (footnote omitted).  Accordingly, to demonstrate that he has a liberty interest in avoiding segregation and loss of privileges, Plaintiff must demonstrate his segregation and loss of privileges constitute atypical and significant hardships in relation to the general population.  See Incumaa, 791 F.3d at 529 (citing Sandin, 515 U.S. at 483; Prieto, 780 F.3d at 251 (placing burden of proof on the inmate)).  In Sandin, the Supreme Court concluded that the plaintiff's "segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest."  515 U.S. at 485.

To determine whether an "atypical and significant hardship" has been imposed, the Supreme Court has outlined a fact intensive inquiry into "(1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence."  Incumaa, 791 F.3d at 530 (citing Wilkinson, 545 U.S. at 214).  Here, other than a loss of privileges, Plaintiff has alleged no other hardship associated with his segregation.[5]  "But changes in a prisoners' location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters

---

[5] Although Plaintiff alleges that other inmates in the segregation unit are putting human waste in the ventilation system, that is not a condition of confinement in segregation.  Plaintiff's allegations about inmates putting waste in the vents are the subject of a separate § 1983 lawsuit he has filed.  See § 1983 Compl., Moore v. Corpening, et al., No. 1:18-cv-00191-FDW (W.D.N.C. filed July 10, 2018), Doc. No. 1.

which every prisoner can anticipate are contemplated by his original sentence to prison[.]" Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991) (citations omitted).

Regarding the duration of his segregation, although he alleges he is "continuously" confined in segregation, Plaintiff's Complaint states that he was placed in D-Unit of the RDU program upon his transfer to MCI on June 20, 2017 (Compl. 7 ¶ 9) and that he was in that same unit when he filed his April 3, 2018 grievance (Compl. 14-15 ¶¶ 48-53). He identifies only one instance that he was put in segregation, and that, according to Plaintiff, was in retaliation for filing the April 3, 2018 grievance. (Compl. 15 ¶ 53, 16 ¶ 55.) In short, Plaintiff has not identified a single instance in which he was placed in administrative segregation for refusing to participate in or complete the RDU program.

As for the only instance of segregation Plaintiff has identified, Courts have held that a temporary assignment to segregated confinement—for thirty days or even six months, even with reduced privileges, few out-of-cell activities or socialization opportunities, and heightened security measures—is not an atypical or significant hardship. See Sandin, 515 U.S. at 485-86 (30 days); Beverati, 120 F.3d at 504 (finding six months under conditions dictated by administrative segregation policies was not atypical under Sandin). In a letter to Defendant Corpening, Plaintiff states he was moved from D-Unit to E-Unit on May 3, 2018, in retaliation for filing the April 3, 2018 grievance. (May 10, 2018 Let., Pl.'s Ex. No. 5, Doc. No. 1-1 at 11.) Plaintiff filed the instant Complaint on May 23, 2018. (Compl. 39.)

Finally, Plaintiff has not alleged that administrative segregation has had any collateral consequences on his sentence. In sum, the Complaint is completely devoid of facts indicating that Plaintiff was placed in segregation for refusing to participate in the RDU program or that the only period of segregation alleged in the Complaint posed, or poses, an atypical and significant

hardship in relationship to the ordinary incidents of prison life.

Furthermore, with the exception of Defendant York,[6] Plaintiff has not alleged facts showing how each individual Defendant personally participated in Plaintiff's placement in segregation or what role each Defendant played in denying Plaintiff privileges. See Monell, 436 U.S. at 694 (stating that under § 1983, liability is personal in nature); Graham, 473 U.S. at 166. In other words, Plaintiff does not allege specific facts showing how each Defendant violated his right to due process.

Lastly, the basis for Plaintiff's claim that Defendants violated his right to due process by depriving him of "an opportunity to aggrieve the condition of his confinement" is not clear. The exhibits to the Complaint demonstrate that Plaintiff repeatedly has taken advantage of the grievance process established by the State (Pl's Exs., Doc. No. 1-1 at 1-6) and/or received responses to some of his letters to various prison officials complaining of being assigned to the RDU and not being placed in protective custody (Doc. No. 1-1 at 23-24, 28-29). Plaintiff's dissatisfaction with the outcome of the grievances he has filed, the pace of the grievance process, and the rules restricting how many complaints he may make in a single grievance and how many grievances he may file at one time does not constitute deprivation of an opportunity to aggrieve the conditions of his confinement. Ultimately, however, this claim fails because "inmates have no constitutional entitlement or due process interest in access to a grievance procedure." Booker, 855 F.3d at 541; see also Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any [grievance] procedure voluntarily established by a state."); Mitchell v. Murray, 856 F.Supp. 289, 294 (E.D. Va. 1994) (There is no

---

[6] The Court addressed Plaintiff's allegations against Defendant York in its review of Plaintiff's First Amendment retaliation claim. See Thompson v. Commonwealth of Virginia, 878 F.3d 89, 110 (4th Cir. 2017) ("To the extent that Mr. Thompson alleges that segregation was retaliatory punishment, that argument is better addressed under either the First or Eighth Amendment.").

"fundamental right requiring prison administrators [to] investigate prisoner complaints.").

## IV.   MOTIONS

### A.  Motion for Appointment of Counsel (Doc. No. 2)

There is no absolute right to the appointment of counsel in civil actions such as this one. Therefore, a plaintiff must present "exceptional circumstances" in order to require the Court to seek the assistance of a private attorney for a plaintiff who is unable to afford counsel.  Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987).

This case does not present exceptional circumstances that justify appointment of counsel. Therefore, Plaintiff's motion for the appointment of counsel will be denied.

### B.  Motions for Temporary Restraining Order and Preliminary Injunction (Doc. Nos. 3, 7, 8, 12)

Plaintiff has filed a Motion for Temporary Restraining Order (Doc. No. 3), Motion to Receive Protective Custody (Doc. No. 7), Motion for Speedy Restraining Order and Preliminary Injunction (Doc. No. 8), and Motion for Preliminary Injunction/TRO (Doc. No. 12).  The first two seek a temporary restraining order and a preliminary injunction requiring Defendants to remove him from the RDU program, place him in protective custody, return all of his property and reinstate all of his privileges.  (Doc. No. 3 at 1.)  In order to obtain a preliminary injunction, a plaintiff must establish all four of the following elements:  (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tips in plaintiff's favor; and (4) that an injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

As previously explained, Plaintiff has failed to show he is likely to succeed on the merits of his Eighth, First, and Fourteenth Amendment claims.  Consequently, the Court will deny Plaintiff's first two motions for a preliminary injunction and temporary restraining order (Doc.

Nos. 3, 7.)

Plaintiff's second two motions are related to his allegations that other inmates in the E-Unit, where he currently is housed, are putting human waste in the ventilation system. Because these allegations are the subject of a separate § 1983 lawsuit, see § 1983 Compl., Moore, No. 1:18-cv-00191-FDW at Doc. No. 1, the Court shall dismiss the Motions (Doc. Nos. 8, 12) without prejudice.

### C. Remaining Motions

Plaintiff has filed a Motion asking the Court to force the MCI administration to process his grievances. Plaintiff has attached two grievances he has written but has not submitted to MCI. Instead, he requests that the Court mail the grievances to Defendant Corpening and order him to process them. (Doc. No. 13.)

As noted, inmates have no constitutional entitlement to grievance procedures or access to any grievance procedure. See Adams, 40 F.3d at 75. Therefore, the Court has no jurisdiction to order MCI officials to process Plaintiff's grievances. Additionally, the Court is not a party to Plaintiff's suit and will not mail documents on Plaintiff's behalf. This Motion shall be denied with prejudice.

Finally, Plaintiff's Motion to Transfer from Marion Correctional Institution's E-Unit (Doc. No. 22) is related to his allegations that other inmates are putting human waste in the ventilation system. Therefore, it should be addressed in Plaintiff's other lawsuit. Here, it shall be dismissed without prejudice.

**IT IS, THEREFORE, ORDERED** that:

1. Plaintiff's First Amendment claims against Defendants Corpening and York (Compl. 27 ¶¶ 105, 107-108) are dismissed without prejudice;

2. Plaintiff's First Amendment retaliation claim against Defendant York (Compl. 25 ¶¶ 103-104) survives initial review;

3. Plaintiff's remaining Eighth, First, and Fourteenth Amendment claims are dismissed as either frivolous or for failure to state a claim upon which relief may be granted, <u>see</u> 28 U.S.C. § 1915(e)(2);

4. Plaintiff's Motion for Appointment of Counsel (Doc. No. 2) is **DENIED**;

5. Plaintiff's Motion for Temporary Restraining Order (Doc. No. 3) and Motion to Receive Protective Custody (Doc. No. 7) are **DENIED**;

6. Plaintiff's Motion for Speedy Restraining Order and Preliminary Injunction (Doc. No. 8) and Motion for Preliminary Injunction/TRO (Doc. No. 12) are **DISMISSED without prejudice**;

7. Plaintiff's Motion requesting assistance with grievance process (Doc. No. 13) is **DENIED with prejudice**;

8. Plaintiff's Motion to Transfer from Marion Correctional Institution's E-Unit (Doc. No. 22) is **DISMISSED without prejudice**;

9. The Clerk of Court is directed to terminate all Defendants, except Defendant Adam York, as parties in this action; and

10. **IT IS FURTHER ORDERED** that the Clerk of Court shall commence the procedure for waiver of service as set forth in Local Rule 4.3 for Defendant York, who is a current or former employee of NCDPS.

Signed: August 29,

Frank D. Whitney
Chief United States District Judge